ROBERT J. HANNA, Bar No. 66105
Robert.Hanna@bbklaw.com
MATTHEW L. GREEN, Bar No. 227904
Matthew.Green@bbklaw.com
BEST BEST & KRIEGER LLP
655 West Broadway, 15th Floor
San Diego, CA 92101
Telephone: (619) 525-1300
Facsimile: (619) 233-6118

Attorneys for Defendant and Counterclaimant
SAN DIEGO DATA PROCESSING CORPORATION

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AXON SOLUTIONS, INC., a Delaware corporation,<br><br>  Plaintiff,<br><br>  v.<br><br>SAN DIEGO DATA PROCESSING CORPORATION, a California publicly owned corporation; and the CITY OF SAN DIEGO, a charted political subdivision of the State of California,<br><br>  Defendants.<br><br>SAN DIEGO DATA PROCESSING CORPORATION, a California nonprofit public benefit corporation,<br><br>  Counterclaimant,<br><br>  v.<br><br>AXON SOLUTIONS, INC., a Delaware corporation,<br><br>  Counterdefendant. | Case No. 09 CV 2543 JM (BGS)<br>Judge: Hon. Jeffrey T. Miller<br><br>DEFENDANT AND COUNTERCLAIMANT SAN DIEGO DATA PROCESSING CORPORATION'S OPPOSITION TO PLAINTIFF AND COUNTERDEFENDANT AXON SOLUTIONS, INC.'S MOTION TO DISMISS FIRST AMENDED COUNTERCLAIM FOR BREACH OF CONTRACT, OR ALTERNATIVELY, MOTION FOR SUMMARY JUDGMENT<br><br>Date:   September 17, 2010<br>Time:   1:30 p.m.<br>Dept.:  Courtroom 16 – Fifth Floor<br><br>Complaint Filed: November 12, 2009 |

Defendant and Counterclaimant San Diego Data Processing Corporation ("SDDPC") respectfully submits the following Opposition to Plaintiff and Counterdefendant Axon Solutions, Inc.'s ("Axon") Motion to Dismiss First Amended Counterclaim for Breach of Contract, or Alternatively, Motion for Summary Judgment.

## I.
## **INTRODUCTION**

The instant counterclaim arises out of numerous deficiencies in Axon's implementation of a new computer system for Defendant City of San Diego ("City"). Under a Master Services Agreement ("MSA") executed with SDDPC in September 2007, Axon agreed to provide professional computer software services, including the development of newly created custom deliverables for implementation, integration, and consulting, and software enhancement of the "mySAP ERP 2005" application for use by the City.[1] (First Am. Counterclaim ("FACC"), ¶¶ 6-7.) The overall project was referred to as the "One SD Initiative" project ("Project"). (FACC, ¶ 5.)

Due to significant concerns regarding Axon's failure to timely complete components of the Project, as well as its inability to properly manage the Project, SDDPC and the City retained SAP Consulting ("SAP") to perform a Design Review of the Project and Axon's performance thereon in the Spring of 2008. (FACC, ¶¶ 11-12.) SAP prepared a detailed report identifying numerous serious project management deficiencies in areas that were the responsibility of Axon ("SAP Report"). (FACC, ¶ 11; SDDPC's RJN, Ex. A.) In addition to providing the SAP Report, SDDPC forwarded Axon a letter drafted by Mary Lewis, the City's Chief Financial Officer, in late May 2008, notifying Axon of related failures on the Project. (FACC, ¶¶ 11-12; SDDPC's RJN, Ex. B.)

From the end of May 2008, when the default letter and SAP Report were provided to Axon, through November 2008, Axon was given nearly six months to cure its deficiencies. (FACC, ¶¶ 11-20.) As a result of Axon's failure to cure its deficient Project management

---

[1] SDDPC is a California nonprofit public benefit corporation formed to provide information technology, project management, telecommunications services, and related administrative services to the City and other public agencies. (First Am. Counterclaim ("FACC"), ¶ 1.)

LAW OFFICES OF
BEST BEST & KRIEGER LLP
655 WEST BROADWAY, 15TH FLOOR
SAN DIEGO, CA 92101

practices, SDDPC terminated the MSA effective December 19, 2008. (FACC, ¶¶ 21-22.)

Following Axon's termination, SDDPC hired SAP to complete the Project in early 2009. (FACC, ¶ 25.) Upon SAP's takeover of the Project, SAP performed additional design reviews to determine the necessary steps to complete the Project. (FACC, ¶¶ 25-26.) Through this process, SDDPC discovered numerous additional failures in Axon's performance on the Project that were unknown prior to the termination of the MSA. (FACC, ¶ 26.) As a result of Axon's breaches of the MSA, including deficiencies discovered both before and after termination of the MSA, completion of the Project was delayed nine months at a cost of an additional $6,000,000. (FACC, ¶ 27.)

In the instant motion to dismiss, Axon once again asserts that SDDPC cannot maintain a counterclaim for breach of contract because judicially noticeable City records and judicial admissions establish that SDDPC terminated the MSA for convenience under Section 2.2 of the MSA. Contrary to SDDPC's assertion, the First Amended Counterclaim contains extensive factual allegations demonstrating compliance with the termination for cause requirements under Section 2.3 of the MSA.

This Court previously held that DPC's original counterclaim did not state a claim upon which relief can be granted because it "[did] not contain factual allegations demonstrating compliance with the requirements of Section 2.3[.]" (Doc. No. 48, at 5:17-5:19.) Namely, "Section 2.3 requires that SDDPC give written notice of default and an opportunity to cure, if the default is curable[,] … [and] compliance with the dispute resolution provisions of Section 21 of the MSA." (Doc No. 48, at 5:14-5:17.) Given that the First Amended Counterclaim now alleges compliance with Section 2.3, the deficiencies in the Court's prior order have been addressed. Axon's reliance on City records and judicial admissions do nothing more than establish that the City requested that SDDPC terminate the MSA for convenience, and that SDDPC's actions also complied with Section 2.3 of the MSA. (See FACC, ¶¶ 22, 24.)

Additionally, even assuming *arguendo* that SDDPC did not comply with Section 2.3, Axon's motion to dismiss completely ignores breaches discovered by SDDPC after termination of the MSA. (FACC, ¶ 26.) Insofar as the Court previously concluded that a termination for

1 convenience is likely deemed a waiver of damages for breach of contract, there can be no waiver
2 of breaches by Axon of which DPC was unaware at the time of termination.  Indeed, under
3 California law, only a "known right" can be intentionally relinquished.  *Habitat Trust for Wildlife,*
4 *Inc. v. City of Rancho Cucamonga*, 96 Cal. Rptr. 3d 813, 830 (Ct. App. 2009).  Accordingly, at a
5 minimum, SDDPC must be permitted to proceed with a counterclaim predicated on those
6 breaches discovered during SAP's design reviews in early 2009.

## II.

## ARGUMENT

### A. THE FIRST AMENDED COUNTERCLAIM CONTAINS FACTUAL ALLEGATIONS DEMONSTRATING COMPLIANCE WITH SECTION 2.3

11 In its June 24, 2010 Order, the Court concluded that SDDPC's original Counterclaim did
12 not state a claim upon which relief can be granted because "SDDPC's counterclaim d[id] not
13 contain factual allegations demonstrating compliance with the requirements of Section 2.3[.]"
14 (Doc. No. 48, at 5:17-19.)  As noted by the Court, "Section 2.3 requires that SDDPC give written
15 notice of default and an opportunity to cure, if the default is curable.  Section 2.3 also requires
16 compliance with the dispute resolution provisions in Section 21 of the MSA."  (Doc. No. 48, at
17 5:14-5:17.)  If SDDPC elected to file an amended counterclaim, the Court directed SDDPC to
18 address these deficiencies. (Doc. No. 48, at 5:21-22.)

19 Pursuant to the Court's instructions, the First Amended Counterclaim alleges (1) written
20 notice to Axon of its defaults, (2) ample opportunity for Axon to cure these defaults, and (3)
21 attempted resolution of the issues via the dispute resolution provisions in the MSA.  With regard
22 to the default notice requirement, Axon was provided with a copy of the 129-paged SAP Report
23 in or about late May 2008.  (FACC, ¶ 11; SDDPC's RJN, Ex. A.)  The SAP Report identified
24 numerous serious project management weaknesses in areas that were the responsibility of Axon,
25 including but not limited to Axon's failure to provide sufficient detail on the to-be business
26 processes in the blueprint and failure to provide sound project management processes.  (FACC, ¶
27 11.)
28 / / /

SDLIT\MGREEN\400172.1 - 3 - OPP'N TO MOT. TO DISMISS FIRST AM. COUNTERCLAIM, OR MOT. FOR SUMM. J.
09 CV 2543 JM (BGS)

At or around the same time, SDDPC provided Axon a letter dated May 27, 2008, authored by the City's Chief Financial Officer, Mary Lewis, notifying Axon of related defaults and failures on the Project. (FACC, ¶ 12; SDDPC's RJN, Ex. B.) This letter explicitly notified Axon that the City had "serious concerns regarding Axon's ability to manage this project and execute the contracted Statement of Work[,]" took issue with "the complete lack of a viable schedule and resource plan," and referred to Axon's overall failures on the Project as a "difficult and concerning situation." (FACC, ¶ 12; SDDPC's RJN, Ex. B.)

While Axon takes issue with the absence of the words "default" or "notice" in the May 27, 2008 letter, (Axon's Mem. of P.&A., at 13:7-14:25), Ms. Lewis considered the letter, coupled with the SAP Report, to constitute "a written notice to cure deficiencies[.]" In a July 9, 2008 memorandum co-authored by Ms. Lewis, the Members of the City Council Rules Committee were advised of the SAP Report and the fact that "[t]he City sent Axon a written notice to cure deficiencies in project management and to respond to the findings contained in the report." (SDDPC's RJN, Ex. C, at 4.) Accordingly, the First Amended Counterclaim properly alleges that Axon was provided written notice of its defaults.

As to the next requirement for compliance with Section 2.3, the First Amended Counterclaim contains detailed factual allegations demonstrating Axon was given an opportunity to cure its defaults. Specifically, Paragraphs 13 through 20 of the First Amended Counterclaim illustrate the opportunities spanning several months provided to Axon to remedy its failures on the Project. Such allegations also describe the numerous representations made by Axon that it would in fact turn the Project around. These averments unequivocally satisfy the opportunity to cure requirement under Section 2.3.

Axon's moving papers nevertheless argue that SDDPC did not comply with the cure provision in the MSA because the cure period should have been limited to only 30 days. (Axon's Mem. of P.&A., at 16:2-16:10.) Axon further suggests that its conduct and commitment to complete the Project undermines SDDPC's allegations that Axon was notified of its defaults. (Axon's Mem. of P.&A., at 15:4-16:1.) Contrary to Axon's assertion, nothing limits the cure period to only 30 days, particularly for "defaults that cannot be reasonably be cured within thirty

1  (30) calendar days[.]" Moreover, where a cure notice is issued, "the contractor has an obligation
2  to take steps to demonstrate or give assurances that progress is being made toward a timely
3  completion of the contract[.]" *Danzig v. AEC Corp.*, 224 F.3d 1333, 1337 (Fed. Cir. 2000). In
4  light of Axon's assurances of performance, SDDPC properly elected to delay Axon's termination
5  to permit Axon a reasonable opportunity to follow through with its representations.

6  As to the final requirement for compliance with Section 2.3, Paragraph 23 of the First
7  Amended Counterclaim alleges that "DPC and its representatives attempted to resolve the City
8  and SDDPC's concerns regarding Axons deficient performance in accordance with the dispute
9  resolution provisions of Section 21." Such allegations indisputably establish compliance with the
10 requirements of Section 2.3 of the MSA.

### B. NONE OF THE CITY'S RECORDS OR JUDICIAL ADMISSIONS CITED BY AXON UNDERMINE SDDPC'S COMPLIANCE WITH SECTION 2.3

13 In its motion to dismiss, Axon asserts that the First Amended Counterclaim is subject to
14 dismissal because SDDPC never affirmatively alleges the MSA was terminated for cause
15 pursuant to Section 2.3. (Axon's Mem. of P.&A., at 5:5-6:11.) Instead, Axon contends that City
16 records indicating that the termination was for convenience, as well as allegations in the First
17 Amended Counterclaim showing compliance with Section 2.2, "conclusively prove" that the
18 termination was for convenience. (Axon's Mem. of P.&A., at 6:22-6:28, 7:11-11:5.)

19 Contrary to Axon's assertion, the First Amended Counterclaim expressly alleges that
20 SDDPC did not follow the City's request to terminate the MSA for convenience under Section
21 2.2. (FACC, ¶ 24.) Rather, in light of SDDPC's compliance with Section 2.3, Axon was notified
22 that the MSA was being terminated under Section 2 of the MSA. (Doc. No. 48, at 2:19-2:20.) In
23 addition, nothing in the City's records or the remainder of the First Amended Counterclaim
24 establishes that the termination was carried out by SDDPC in any other manner.

25 Starting with the allegations in the First Amended Counterclaim, Axon places great
26 emphasis on the fact that SDDPC gave Axon 30 days' advance notice of the effective termination
27 date. (Axon's Mem. of P.&A., at 7:19-8:6.) According to Axon, Section 2.2 only provides for
28 termination for convenience "with 30 days' advance written notice[,]" while Section 2.3 solely

SDLIT\MGREEN\400172.1 - 5 - OPP'N TO MOT. TO DISMISS FIRST AM. COUNTERCLAIM, OR MOT. FOR SUMM. J.
09 CV 2543 JM (BGS)

1  permits termination for cause "within 30 days of giving Axon written notice of default and
2  Axon's failure to cure that would be effective immediately[.]" (Axon's Mem. of P.&A., at 7:12-
3  7:18.) By making the termination effective 30 days after the termination notice, Axon contends
4  SDDPC could only have employed a termination for convenience under Section 2.2. (Axon's
5  Mem. of P.&A., at 7:19-8:6.)

6  Under a proper reading of Section 2.3, however, nothing therein precludes SDDPC from
7  delaying the effective date of termination by 30 days. Indeed, as is deemed true for purposes of a
8  motion to dismiss, "the delay until December 19 for the termination to take effect was critical to
9  ensuring a smooth transition and reducing any disruptions to the overall completion of the OneSD
10 Project." (FACC, ¶ 22.) Axon's purported concern about being forced to continue working an
11 additional 30 days without any expectation of compensation is without merit, as nothing required
12 Axon to stay on the Project. (See Mem. of P.&A., at 12:15-13:2.) Indeed, during this time
13 period, the parties were attempting to reach an amicable resolution of the matter. (SDDPC's
14 Answer (Doc. No. 22), ¶¶ 28, 35 [referencing settlement efforts].) Accordingly, the fact that
15 SDDPC gave 30 days' advance notice of the decision to terminate Axon sheds no light on the
16 specific nature of the termination.

17 Axon next contends that judicially noticeable public documents and alleged admissions by
18 the City and SDDPC prove that the MSA was terminated for convenience. (Axon's Mem. of
19 P.&A., at 8:7-11:5.) Specifically, Axon relies on (1) a November 19, 2008, memorandum
20 prepared by City staff directing SDDPC to terminate the MSA for convenience, (2) a November
21 20, 2008, memorandum prepared by City staff informing the City Council of Axon's termination,
22 and (3) settlement discussions that took place among the parties prior to the effective termination
23 date. (Axon's Mem. of P.&A., at 9:1-10:23.) With regard to City staff's statements, as an
24 evidentiary matter, such statements cannot be attributed to SDDPC or its staff. Moreover, the
25 First Amended Counterclaim expressly alleges that SDDPC did not follow the City's request to
26 terminate for convenience under Section 2.2.[2] As to settlement discussions, of course there was a

---

[2] While the existence of City memoranda may be subject to judicial notice as public records, the truth of the statements made therein is not judicially noticeable. *Olivera v. Am. Home Mortgage Servicing, Inc.*, 689 F. Supp. 2d 1218, 1222 n.4 (N.D. Cal. 2010) (denying request for judicial notice of the truth of the contents of documents on

SDLIT\MGREEN\400172.1      - 6 -      OPP'N TO MOT. TO DISMISS FIRST AM. COUNTERCLAIM, OR MOT. FOR SUMM. J.
09 CV 2543 JM (BGS)

1  need to resolve issues relating to payment of Axon as soon as the termination notice was issued.
2  Indeed, the parties are now in litigation nearly two years later relating to the very same dispute.

3      Additionally, SDDPC's allegations of compliance with Section 2.3 undermine any reason
4  to preclude the assertion of a counterclaim for breach of contract.  The principal rationale for
5  barring counterclaims where a contract has been terminated for convenience, as advocated by
6  Axon, is that a "termination for convenience deprive[s] the plaintiff of its contractual rights to
7  cure the alleged defects[.]"  (Axon's Mem. of P.&A., at 18:8-18:11 (citing *Fruin-Colnon Corp.,*
8  *et al. v. Niagara Frontier Trans. Auth.*, 180 A.D.2d 222 (N.Y. App. Div. 1992).)  This rationale
9  has no application in the instant action.  The First Amended Counterclaim sets forth extensive
10 factual allegations describing the roughly six-month period in which Axon was on notice of its
11 defaults and was provided ample opportunity to cure said defaults.  (FACC, ¶¶ 11-21.)  Given
12 that the First Amended Counterclaim alleges facts showing compliance with Section 2.3 of the
13 MSA, the Court should deny Axon's motion to dismiss.

14  **C. THE FIRST AMENDED COUNTERCLAIM ALSO SEEKS DAMAGES FOR BREACHES UNKNOWN AT THE TIME OF TERMINATION**
15

16  In addition to seeking damages for breaches known by SDDPC prior to termination of the
17 MSA, the First Amended Counterclaim also seeks damages for breaches that were not discovered
18 until SAP's takeover of the Project in early 2009.  As part of a post-termination design review in
19 January 2009, SAP identified approximately 213 design issues concerning Axon's work on the
20 Project, the majority of which required a correction of, or change in, Axon's design.  (FACC, ¶
21 25; SDDPC's RJN, Exs. D, E.)  Deficiencies in Axon's work identified by SAP included, but
22 were not limited to, Axon's failure to align the system with the City's project objectives; Axon's
23 failure to satisfy critical business requirements, design integrity/integration problems; overly
24 complex solutions; a high risk of user execution error; a high support effort required to maintain
25 the system; and restrictions/limits on future design expansion. (FACC, ¶ 25; SDDPC'S RJN, Exs.

---

26 12(b)(6) motion); *San Luis & Delta-Mendota Water Auth. v. Salazar*, 666 F. Supp. 2d 1137, 1143 n.3 (E.D. Cal.
27 2009) (granting judicial notice of the existence of public records, "but not the truth of the matters asserted therein").
Judicial notice may be taken "only for the purpose of determining what statements the documents contain, not to
28 prove the truth of the documents' contents."  *Olivera*, 689 F. Supp. 2d at 1222 n.4 (quoting *Lovelace v. Software
Spectrum, Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996).)

LAW OFFICES OF
BEST BEST & KRIEGER LLP
655 WEST BROADWAY, 15TH FLOOR
SAN DIEGO, CA 92101

1  D, E.)

2  Moreover, once SAP began to implement the required changes and corrections in Axon's work on the Project, it was discovered that the production environment created by Axon was out of sync with its test environment and required a complete reconfiguration before any corrective measures could be taken. (FACC, ¶ 26.) Axon's failure to create operational environments, as well as many of the design failures identified in SAP's January 2009 design review, were unknown to SDDPC prior to its termination of the MSA. (FACC, ¶ 26.)

The central argument raised by Axon in its moving papers is that a termination for convenience constitutes a waiver of any remedies that would otherwise be available for breach of the MSA. While the First Amended Counterclaim contains ample allegations of compliance with the termination for cause requirements under Section 2.3, Axon's argument has no application to breaches that SDDPC did not discover until after the termination.

The California Court of Appeal has recently opined:

> All case law on the subject of waiver is unequivocal: Waiver always rests upon intent. Waiver is the intentional relinquishment of ***a known right after knowledge of the facts***. The burden, moreover, is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and doubtful cases will be decided against a waiver. *Habitat Trust for Wildlife, Inc. v. City of Rancho Cucamonga*, 96 Cal. Rptr. 3d 813, 830 (Ct. App. 2009) (citations and quotations marks omitted) (emphasis added).

The key requirement for a waiver of a contractual remedy is knowledge of the alleged right and the facts relating thereto. Here, the First Amended Counterclaim expressly alleges breaches and material defaults of which DPC was unaware at the time of Axon's termination in November 2008. Given that such breaches were unknown at that time, SDDPC as a matter of law could not have waived any rights relating thereto. Accordingly, at a minimum, SDDPC is entitled to pursue damages again Axon for breaches that were not discovered until after the termination.

/ / /

/ / /

/ / /

/ / /

## III.

## CONCLUSION

For the reasons set forth above, the Court should deny Axon's motion to dismiss, or alternatively, motion for summary judgment.

Dated: September 2, 2010				BEST BEST & KRIEGER LLP


							By: /s/   Robert J. Hanna
							    ROBERT J. HANNA
							    MATTHEW L. GREEN
							    Attorneys for Defendant and
							    Counterclaimant
							    SAN DIEGO DATA PROCESSING
							    CORPORATION

LAW OFFICES OF
BEST BEST & KRIEGER LLP
655 WEST BROADWAY, 15TH FLOOR
SAN DIEGO, CA 92101

SDLIT\MGREEN\400172.1                - 9 -                OPP'N TO MOT. TO DISMISS FIRST AM.
                                                          COUNTERCLAIM, OR MOT. FOR SUMM. J.
                                                          09 CV 2543 JM (BGS)