MICHAEL J. IOANNOU (SBN 95208)
LITA M. VERRIER (SBN 181183)
DANIEL P. McKINNON (SBN 234749)
ROPERS, MAJESKI, KOHN & BENTLEY
50 W. San Fernando St., Suite 1400
San Jose, CA 95113
Telephone: (408) 287-6262
Facsimile: (408) 918-4501
mioannou@rmkb.com;
lverrier@rmkb.com;
dmckinnon@rmkb.com

Attorneys for Plaintiff and Counterdefendant
AXON SOLUTIONS, INC.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AXON SOLUTIONS, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>SAN DIEGO DATA PROCESSING CORPORATION, et al.,<br><br>Defendants.<br><br>AND RELATED COUNTERCLAIM. | CASE NO. 09 CV 2543 JM BGS<br>The Honorable Jeffrey T. Miller<br><br>**PLAINTIFF AXON SOLUTIONS, INC.'S REPLY TO OPPOSITION TO MOTION TO DISMISS DEFENDANT SAN DIEGO DATA PROCESSING CORPORATION'S FIRST AMENDED COUNTERCLAIM FOR BREACH OF CONTRACT [FRCP 12(b)(6); OR ALTERNATIVELY, MOTION FOR SUMMARY JUDGMENT [FRCP 12(d) and 56]**<br><br>**Date:** September 24, 2010<br>**Time:** 1:30 p.m.<br>**Courtroom:** 16, 5th Floor<br>**Complaint filed:** November 12, 2009 |

**I.     SDDPC DOES NOT ALLEGE AXON WAS TERMINATED FOR CAUSE**

The First Amended Counterclaim ("FACC") fails as a matter of law because SDDPC does not allege whether it terminated the MSA for convenience pursuant to Section 2.2 or for cause pursuant to Section 2.3.  This is the central issue of the FACC because as the Court has already explained, "[i]t appears the MSA does not provide a breach of contract remedy to SDDPC if SDDPC terminated the contract pursuant to Section 2.2."  (Doc. No. 48 at 5:10-11).  SDDPC distorts this Court's prior order, arguing that because the FACC "now alleges compliance with Section 2.3, the deficiencies in the Court's prior order have been addressed."  (Doc. No. 62, ("Opp.") at 3:21-22.)  This was just one of the deficiencies identified by the Court.

The Court also found that SDDPC had "not clearly alleged in its counterclaim whether it terminated the MSA under Section 2.2 or Section 2.3" and that "SDDPC's current counterclaim does not state a claim **if** SDDPC terminated the MSA [for cause] pursuant to Section 2.3" because SDDPC failed to allege factual allegations demonstrating it complied with Section 2.3 of the MSA. (emphasis added) (Doc. No. 48 at 5 *Id*. at pgs. 3-5).  SDDPC's FACC and Opposition focus almost exclusively on whether it complied with Section 2.3 of the MSA, but never alleges or argues that SDDPC terminated the MSA pursuant to Section 2.3.  SDDPC cannot allege this simple fact because it did not happen.  The MSA was terminated for convenience pursuant to Section 2.2.  This is the only conclusion consistent with the allegations of the FACC, documents and communications that are incorporated by reference or may be judicially noticed pursuant to Rule 12(b)(6), or evidence that is before the Court in support of Axon's alternative Motion for Summary Judgment.

By electing to terminate the MSA for convenience pursuant to Section 2.2, it is irrelevant whether SDDPC complied with the requirements to terminate the MSA for cause pursuant to Section 2.3.  Once a party makes an election to terminate a contract, either for cause or for convenience, that party cannot later avail itself of any rights it would have had if it had made a different election.  *Rogerson Aircraft Corp. v. Fairchild Industries, Inc.*, 632 F. Supp. 1494, 1499 (C.D. Cal. 1986).  This is not disputed by SDDPC.  Rather, SDDPC attempts to hide critical facts to survive dismissal, alleging only that it did not follow the City's instructions to terminate the

RC1/5689585.2/DPM     -1-     Plaintiff Axon's Reply to Opp. To Its Motion To Dismiss SDDPC's First Amended Counterclaim
Case No. 09 CV 2543 JM BGS

1  MSA for convenience:

2  > Contrary to Axon's assertion, the First Amended Counterclaim expressly alleges
3  > that SDDPC did not follow the City's request to terminate the MSA for
   > convenience under Section 2.2. (FACC, 24.) Rather, in light of SDDPC's
   > compliance with Section 2.3, Axon was notified that the MSA was being
4  > terminated under Section 2 of the MSA. (Opp. at 6:19-22).

5  Like its prior pleadings, SDDPC claims that the MSA was terminated pursuant to Section
6  2 of the MSA. (*See e.g.*, Doc. No. 24-1 (SDDPC's Counterclaim) at ¶8). Section 2 is nothing
7  more than the heading titled "Duration and Termination". There are three different ways the
8  MSA could be terminated under Section 2 (for convenience, for cause, or for lack of funding).
9  Even assuming SDDPC did not follow the City's directions (which is contradicted by the FACC's
10 factual allegations, judicial admissions, public records, and the parties' communications), SDDPC
11 could have elected itself to terminate the MSA for convenience, irrespective of the City's
12 directions. Therefore, by failing to allege SDDPC terminated the MSA for cause pursuant to
13 Section 2.3, SDDPC's breach of contract claim does not "raise a right to relief above the
14 speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

15 **II.     SDDPC DID NOT COMPLY WITH SECTION 2.3 OF THE MSA**

16 In addition to never alleging the MSA was terminated for cause, the allegations of the
17 FACC establish as a matter of law that SDDDPC did not comply with the requirements of Section
18 2.3. If the MSA had been terminated for cause, SDDPC would have no difficulty alleging facts
19 demonstrating compliance with Section 2.3. SDDPC would simply need to allege that within 30
20 days of issuing a written notice of default and Axon's inability to cure, Axon was immediately
21 terminated pursuant to Section 2.3. SDDPC does not and cannot allege these basic facts.

22 Instead, SDDPC alleges it forwarded a letter drafted by the City in May 2008 outlining
23 insufficiencies of Axon's updated Proposed Plan for the project. (FACC at ¶12). SDDPC claims
24 the letter is a "default notice", even though it was drafted by the City, who is not a party to the
25 MSA. Further, nothing in the letter suggests or implies it was a default notice, intended to put
26 Axon on notice that it had 30 days to cure the purported defaults or would be immediately
27 terminated pursuant to Section 2.3. Then, six months later, after being instructed by the City to
28 terminate the MSA for convenience pursuant to Section 2.2, SDDPC terminates the MSA "under

1  Section 2" by giving Axon 30 days' advance written notice (as is required to terminate the MSA
2  for convenience). The FACC fails to allege it rejected any of Axon's deliverables, or any facts
3  demonstrating it complied with the dispute resolution provisions of Section 21.

4      SDDPC's allegations establish that SDDPC did not comply with Section 2.3 because: 1)
5  the letter written by the City does not as a matter of law constitute a written default notice by
6  SDDPC; 2) the MSA was not immediately terminated upon issuing the written notice of
7  termination and within 30 days of the purported default notice; and 3) SDDPC did not reject any
8  deliverables or comply with the dispute resolution provisions of the MSA.

9      **A.    The May 27, 2008 Letter From The City Was Not A "Notice Of Default"**

10      SDDPC argues that the May 27, 2008 letter from the City constituted a written notice of
11  default pursuant to Section 2.3 because "Ms. Lewis considered the letter, coupled with the SAP
12  Report, to constitute 'a written notice to cure deficiencies.'" (Opp. at 5:8-10). Whether Ms.
13  Lewis, a City employee, who is not a party to the MSA, "considered" the letter to be a "written
14  notice to cure deficiencies" is entirely irrelevant. Whatever Ms. Lewis may have thought about
15  her May 27, 2008 letter, cannot as a matter of law, contradict the fact that SDDPC never issued a
16  written notice of default, putting Axon on notice that SDDPC considered Axon in material default
17  and Axon was required to cure the default within 30 days or would be immediately terminated for
18  cause pursuant to Section 2.3 of the MSA.

19      The May 27, 2008 letter was merely a letter from a third party, the City, to Axon, openly
20  discussing concerns the City had with the ongoing project and ways of improving the
21  implementation process. This is confirmed by the July 9, 2008 memorandum co-authored by Ms.
22  Lewis cited by SDDPC in support its Opposition, which states:

> In March 2008, the Project Sponsor (Mary Lewis, CFO) and Business Leader (Greg Levin, Comptroller) contracted to have SAP review the project and make recommendations for improving the implementation process. The report (attached) identified several opportunities for improvement and was received in final form on June 23, 2009.
>
> …
>
> The SAP assessment and the findings were a crucial step in ensuring project success while identifying critical areas for improvement. Additionally, the completion of the assessment at this phase of the project enabled timely intervention by the City to ensure Axon was able to cure any deficiencies and

remediate risks. That being said, the assessment also highlighted that a significant amount of quality work as been accomplished by dedicated City and Axon technical teams. (SDDPC's RJN, Ex. C. at C-4 through C-5).

According to Ms. Lewis, the City had "[a]pproximately 40 full time equivalent City staff members from City departments [] working in cross functional teams with Axon technical staff to integrate the SAP software." *Id*. at C-1. This memorandum confirms the SAP Report and the May 27, 2008 letter was part of an open discussion between Axon and the City to identify problems with the implementation process early, so that they could be resolved, and the implementation process could be improved as a whole so that Axon and the City could successfully complete the project. In stark contrast to describing a default notice and pending termination, Ms. Lewis states that "a significant amount of quality work as been accomplished by dedicated City and Axon technical teams." *Id.* Therefore, the evidence relied upon by SDDPC contradicts its allegation that the May 27, 2008 letter was a written notice of default pursuant to Section 2.3.

### B. SDDPC Did Not Immediately Terminate The MSA Within 30 Days Of Written Notice Of Default

SDDPC argues that "[u]nder a proper reading of Section 2.3, however, nothing therein precludes SDDPC from delaying the effective date of termination by 30 days." (Opp. at 6:6-7). This is flatly contradicted by the express language of Section 2.3. Section 2.3 of the MSA provides that "**within thirty (30) calendar days after written notice of default**", or for those defaults that cannot be cured within 30 days, "then the Party not in default may terminate this Agreement by giving written notice of the termination to the defaulting Party**, which termination shall be effective immediately upon receipt of the notice of termination."** [Emphasis added.] "The words of a contract are to be understood in their ordinary and popular sense." Civ. Code, § 1644. "Shall" is defined as "(having a) duty to; more broadly, is required to." *Black's Law Dictionary* 1379 (7th ed., West 1999); *See also Northern Cal. Dist. Council of Laborers v. Pittsburg-Des Moines Steel Co.*, 69 F.3d 1034 (9th Cir. 1995); *Sterling Forest Associates v. Barnett-Range Corp.*, 840 F.2d 249, 250, 252 (4th Cir. 1988).[1]

---

[1] SDDPC admits that the use of the word "may" in the MSA connotes permissive language, while use of the term "shall" connotes mandatory language. Doc. No. 42 at pg. 5:9-14.

1    Section 2.3 of the MSA unambiguously requires a termination for default to occur "within
2    thirty (30) calendar days after written notice of default" and "shall be effective immediately upon
3    receipt of the notice of termination."  These are mandatory requirements that protect the rights
4    and obligations of the non-terminating party.  Section 2.3 distinguishes between what actions are
5    permissive and what actions are mandatory.  Section 2.3 provides that the party not in default
6    "may" terminate the MSA pursuant to Section 2.3 if the non-terminating party is in default.  This
7    is permissive, allowing the non-defaulting party the option to terminate or enforce the MSA.

8    However, if the non-defaulting party elects to terminate the MSA pursuant to Section 2.3,
9    the termination must be effective immediately upon issuing the notice of termination and within
10   30 days of any default notice.  The words "shall be effective immediately" are mandatory.  The
11   fact that the parties reasonably used the words "may" in some instances and "shall" in others,
12   shows the parties intended that some actions under Section 2.3 be permissive, while others are
13   mandatory.

14   SDDPC concedes, as it must, that the termination was not effective immediately upon
15   issuing the notice of termination.  Instead, SDDPC argues that "[c]ontrary to Axon's assertion,
16   nothing limits the cure period to only 30 days, particularly for 'defaults that cannot reasonably be
17   cured within thirty (30) calendar days.'"  (Opp. at 5:27-6:1).  SDDPC's argument misses the
18   point.  The sentence quoted by SDDPC permits the terminating party to terminate the MSA for
19   cause immediately if the defaults cannot reasonably be cured within thirty days.  Further, the non-
20   defaulting party is not required to terminate the MSA, but "may" choose to do so.  Nevertheless,
21   once the non-defaulting party elects to terminate the MSA for cause, the termination must still
22   "be effective immediately upon receipt of the notice of termination".

23   Section 2.3 strikes a balance between the non-defaulting party's right to terminate the
24   MSA, while protecting the rights of the non-terminating party.  Unlike a termination for
25   convenience pursuant to Section 2.2, where the non-terminating party continues to work during
26   the 30 day notice period because it has an expectation and entitlement to compensation for the
27   work done up to the effective termination date, where a party is terminated for cause, there is no
28   expectation or legal right to compensation for the work done prior to or after the notice of

termination because the terminating party may assert damages arising from the termination for cause. That is why a termination for cause pursuant to Section 2.3 must be effective immediately, whereas a termination for convenience pursuant to Section 2.2 is with 30 days' advance written notice. This distinction is explained in *Discount Co., Inc. v. The United States*, 554 F.2d 435, 437 at fn. 1, which was relied on by *Danzig v. AEC Corp.*, 224 F.3d 1333 (Fed. Cir. 2000), cited by SDDPC and discussed below:

> Under a termination for convenience, a contractor may receive his costs and any profit to date. If terminated for default, the contractor loses compensation for unpaid work-in-progress, and may be liable for delay r liquidated damages and excess costs of reprocurement. *See, e.g., G.L. Christian and Assoc. v. United States*, 160 Ct. Cl. 1, 312 F.2d 418, *cert. denied*, 375 U.S. 954 (1963); R. Nash & J. Cibinic, Federal Procurement Law, pp. 651-90, 755-778, 2d ed. (1969).

SDDPC argues that Axon was not terminated immediately upon issuing the written notice of termination because they wanted to ensure a smooth transition and reduce disruptions. (Opp. at 6:7-9). SDDPC cannot deprive Axon of its rights under the MSA by unilaterally, and without notice, changing express terms that are designed to protect the non-terminating party. There is nothing in Section 2.3 or other provisions of the MSA which allow SDDPC to disregard the MSA's requirement that a termination for cause be effective immediately upon termination and within 30 days of the default notice. In fact, any changes to the contract must be in writing and agreed to by the parties.[2] (Doc No. 20 (FAC), Exh 1 (MSA) at pg. 11, Sections 16 and 17.1).

### C. SDDPC Accepted Axon's Work and Did not Satisfy the Dispute Resolution Procedures

In granting Axon's Motion to Dismiss SDDPC's Counterclaim, the Court previously determined that SDDPC failed to allege facts demonstrating "compliance with the dispute resolution provisions in Section 21 of the MSA". (Opp. at 2:16-21; *See also* Doc. No. 48 at 5:14-17). Like its original counterclaim, the FACC does not contain any factual allegations demonstrating it rejected any of Axon's work, provided Axon with a description why any particular deliverable could not be approved, or attempt to resolve any dispute pursuant to Section

---

[2] *Danzig v. AEC Corp.*, 224 F.3d 1333 (Fed. Cir. 2000), cited by SDDPC, does not support SDDPC's argument that SDDPC "properly elected to delay Axon's termination". Nothing in Danzig suggests a party can ignore the express terms of the a contract that requires a termination for cause to be effective immediately within 30 days of issuing a default notice. Rather, *Danzig* involved general principals of anticipatory repudiation, which are inapplicable here.

21 as required by the Acceptance Procedure set forth in the SOW, and Sections 2.3 and 3.10.4 of the MSA. Rather, SDDPC relies entirely on conclusory allegations that are devoid of facts:

> As to the final requirement for compliance with Section 2.3, paragraph 23 of the First Amended Counterclaim alleges that "DPC and its representatives attempted to resolve the City and SDDPC's concerns regarding Axons [sic] deficient performance in accordance with the dispute resolution provisions of Section 21." Such allegations indisputably establish compliance with the requirements of Section 2.3 of the MSA. (Opp. at 5:6-10).

The court need not "accept any unreasonable inferences or assume the truth of legal conclusions cast in the form of factual allegations." *Ileto v. Glock Inc.*, (9th Cir. 2003) 349 F.3d 1191, 1200.

### 1. Alleged Deficiencies Discovered After Termination

SDDPC argues it is entitled to pursue damages for deficiencies discovered in January 2009. Opp. at 7:18-20. However, the MSA required that SDDPC to timely reject these deliverables, notify Axon in writing why it was rejecting these deliverables, and give Axon an opportunity fix any purported deficiencies. The "Acceptance Procedure" set forth in the SOW provides that SDDPC must approve or disapprove acceptance of the deliverables within five (5) business days, and if the deliverables are "neither approved nor rejected within five (5) business days, the Deliverable will be deemed to have been approved by DPC without change or comment." (Doc. No. 20 (FAC), Exh. 1 at pg. 41). Section 3.10 of the MSA, which governs warranty claims, requires SDDPC to provide "to Axon in writing a reasonably detailed description of the error or defect in the provision of the Services or Deliverables within thirty (30) days from the date on which the applicable service was performed or the Deliverable delivered." Once Axon is notified of the deficiency, Axon must, at its own expense, "remedy the error or defect in question" pursuant to Section 3.10.4. *Id.* at pg. 5. The time to report any defects was extended to March 19, 2009. *Id.*, Exh. 8 at pg. 230.

The MSA requires that Axon be given notice any claimed defect and a reasonable opportunity to cure. SDDPC fails to allege that it complied with the express provisions of the MSA that required SDDPC to timely accept or reject the deliverables, provide Axon with a written description and opportunity to cure any error or defect, and engage in the dispute

resolution provisions of Section 21. "**Where contractual liability depends upon the satisfaction or performance of one or more conditions precedent, the allegation of such satisfaction or performance is an essential part of the cause of action**." *Careau & Co. v. Sec. Pac. Bus. Credit*, 222 Cal.App.3d 1371, 1389, (1990) [Emphasis added.] Therefore, SDDPC waived those rights by failing to reject any of Axon's deliverables, notify Axon of any deficiencies in the deliverables, or attempt to resolve any dispute with respect to the deliverables.

### III. SDDPC TERMINATED THE MSA FOR CONVENIENCE PURSUANT TO SECTION 2.2

There can be no reasonable dispute that the MSA was terminated for convenience pursuant to Section 2.2. This is the only conclusion that can be drawn from the FACC, documents and communications that are incorporated by reference or may be judicially noticed pursuant to Rule 12(b)(6), or evidence that is before the Court in support of Axon's alternative Motion for Summary Judgment.

SDDPC's allegations confirm that the MSA was terminated for convenience. SDDPC alleges it terminated the contract by giving Axon 30 days' written notice of termination pursuant to Section 2 of the MSA. As discussed above, if the MSA was terminated for cause pursuant to Section 2.3, SDDPC's notice of termination was required to be effective immediately. On the other hand, if the MSA was terminated for convenience pursuant to Section 2.2, SDDPC was required to provide Axon 30 days' notice of termination. That is exactly what SDDPC alleges occurred.

SDDPC relies solely on its allegations, failing to offer any evidence that SDDPC terminated the MSA for cause pursuant to Section 2.2. The evidence, whether weighed substantively on its merits pursuant to Rule 56, considered as part of the FACC, or considered pursuant to the Court's power to take judicial notice, conclusively prove that the MSA was terminated for convenience pursuant to Section 2.3.

SDDPC does not dispute that SDDPC's formal termination notice requests that Axon contact SDDPC regarding settlement of the wind-down costs, and SDDPC admits in its Answer to the FAC that the parties engaged in settlement discussions over the next 30 days culminating in

1  a final billing invoice of $4,863,028 for work performed and wind-down costs through December
2  19, 2008.  RJN, ¶4, SDDPC's Answer to FAC, Doc. No. 24 at ¶28, See also ¶35.  Indeed,
3  SDDPC's Opposition confirms the parties engaged in settlement discussions regarding the monies
4  owed to Axon:  "As to settlement discussions, of course there was a need to resolve issues
5  relating to payment of Axon as soon as the termination notice was issued."  (Opp. at pg. 7:26-
6  8:2).  As discussed above, there was no reason to discuss settlement or entitlement to wind-down
7  costs if Axon had been terminated for cause pursuant to Section 2.3.  *Discount Co., Inc. v. The*
8  *United States*, 554 F.2d 435, 437 at fn. 1.

9        As the City's wholly owed IT service provider, the circumstances of Axon's termination
10 is well documented in public records.  As evidenced by the July 9, November 19, and 20, 2008
11 reports to the City Council, the City was directly involved in managing the MSA and
12 implementation process.  These documents confirm, without reasonable dispute, that at the time
13 the contract was being performed and prior to any conflict or litigation, SDDPC terminated Axon
14 for convenience pursuant to Section 2.2 of the MSA.  Acts of the parties, subsequent to the
15 execution of the contract and before any controversy has arisen as to its effect, may be looked to
16 in determining the meaning and effect of the contract.  Witkin, *Summary of California Law* (10th
17 ed.) at § 749, p. 839.  This is confirmed by the City's admission "that on November 19, 2008,
18 SDDPC terminated Axon based on conveniences as allowed by Section 2.2 of the Master
19 Services Agreement."[3]  RJN ¶5; See also Doc. No. 41 at pg. 4, ¶18.

20       SDDPC offers no explanation, let alone, evidence that creates a factual dispute as to
21 whether the MSA was terminated for convenience for the purposes of summary judgment (to the
22 extent the Court cannot come to the same conclusion pursuant to Rule 12(b)(6)).  SDDPC only
23 argues that "[w]ith regard to City staff's statements, as an evidentiary matter, such statements
24 cannot be attributed to SDDPC or its staff.  Moreover, the First Amended Counterclaim expressly

---

[3] The City recently filed a Motion for Leave to File an Amended Answer. Doc. No. 63.  The City is trying allege facts that are completely inconsistent with its Answer – specifically, the City is trying to change its allegation that the MSA was terminated for convenience, not cause.  As will be discussed more thoroughly in Axon's Opposition to the City's Motion for Leave, a proposed amended pleading "cannot allege facts inconsistent with the challenged pleading." *Alvarez v. Lake County Bd. Of Supervisors*, 2010 U.S. Dist. LEXIS 95109, *citing Reddy v. Litton Indus.*, 912 F.2d 291, 296 (9th Cir. 1990).

1   alleges that SDDPC did not follow the City's request to terminate for convenience under Section
2   2.2." (Opp. at 7:23-26.).
3           As discussed above, the FACC does not raise a right to relief above a speculative level
4   because although SDDPC alleges it did not follow the City's directions, SDDPC never alleges
5   that it terminated the MSA for cause pursuant to Section 2.3. Further, SDDPC's own allegations
6   that Axon was terminated by giving 30 days' advance written notice, the written termination
7   notice addressing Axon's wind-down costs, public records and judicial admissions that the MSA
8   was terminated for convenience pursuant to Section 2.2, and judicial admissions and
9   communications related to settlement discussions for the amounts owed to Axon, confirm the
10  MSA was terminated for convenience, not cause.[4] Further, SDDPC's arguments are internally
11  inconsistent. The FACC is based on City staff statements – specifically, statements by Ms.
12  Lewis, the City's CFO, in the May 2008 letter that SDDPC claims is a default notice under
13  Section 2.3. If the City's statements are to be disregarded, then SDDPC's FACC fails as a matter
14  of law because the May 2008 letter is not a default notice by SDDPC pursuant to Section 2.3.
15  Conversely, if the City's statements are not disregarded, the FACC fails as a matter of law
16  because they confirm the MSA was terminated for convenience pursuant to Section 2.2.

17  **IV.    CONCLUSION**
18          Based on the foregoing reasons and authorities, Axon respectfully requests the Court grant
19  Axon's Motion to Dismiss SDDPC's First Amended Counterclaim for Breach of Contract
20  pursuant to Rule 12(b)(6). Alternatively, to the extent the Court is unwilling to dismiss SDDPC's
21  amended counterclaim pursuant to Rule 12(b)(6), Axon respectfully requests the Court convert its
22  motion to dismiss to a motion for summary judgment pursuant to Fed.R.Civ.P. 12(d) and 56.

---

[4] The court need not accept as true, allegations that contradict facts which may be judicially noticed such as matters of public record including pleadings, orders, and other papers filed with the court or records of administrative bodies. See *Mullis v. United States Bankruptcy* Ct. (9th Cir. 1987) 828 F.2d 1385, 1388; *Mack v. South Bay Beer Distributors* (9th Cir. 1986) 798 F.2d 1279, 1282.

RC1/5689585.2/DPM                           - 10 -                  Plaintiff Axon's Reply to Opp. To Its Motion To
                                                                    Dismiss SDDPC's First Amended Counterclaim
                                                                    Case No. 09 CV 2543 JM BGS

| | |
|---|---|
| Dated: September 17, 2010 | ROPERS, MAJESKI, KOHN & BENTLEY |
| | By: /s/ Daniel P. McKinnon |
| | MICHAEL J. IOANNOU |
| | LITA M. VERRIER |
| | DANIEL P. McKINNON |
| | Attorneys for Plaintiff |
| | AXON SOLUTIONS, INC. |